## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### Judge Christine M. Arguello

Civil Action No. 08-cv-00752-CMA-MJW

DENNIS MARLOW,

      Plaintiff,

v.

ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA,
HUGH ALEXANDER, and
DOES A through K,

      Defendants.

---

## ORDER ON DEFENDANTS' MOTIONS TO DISMISS

---

This matter is before the Court on motions to dismiss Plaintiff's Second Amended Complaint filed by both Defendant Hugh Alexander (Doc. # 57) and Defendant Allianz Life Insurance Company of North America (Doc. # 58). For the following reasons, the motions are GRANTED.

### INTRODUCTION

This case arises from what Plaintiff Dennis Marlow alleges was an unlawful conspiracy between his former employer, Defendant Allianz Life Insurance Company of North America ("Allianz"), and his former lawyer, Defendant Hugh Alexander ("Alexander") to make Plaintiff the scapegoat in an investigation into Allianz's improper insurance sales practices. In April 2008, Plaintiff filed his initial complaint, asserting claims for violation of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), breach of fiduciary duty, fraud, and negligence. (Doc. # 1). Plaintiff twice

amended this complaint, filing the operative second amended complaint in August 2008. (Doc. # 38).  In addition to his initial claims, the second amended complaint included claims for aiding and abetting breach of fiduciary duty and civil conspiracy to breach fiduciary duty.  Defendants filed separate motions to dismiss for failure to state a claim, both of which focus primarily on Plaintiff's RICO claim.  Those motions are fully briefed and ripe for decision.

## BACKGROUND

Allianz sells deferred annuities, which are essentially investment vehicles that delay the payout of income for some period of time.  For purposes of this Order on Defendants' Motions to Dismiss, the Court accepts as true the following allegations as set forth in Plaintiff's complaint.  In 2000 Allianz began to aggressively target its efforts to sell deferred annuities toward senior citizens, even though those products might not be suitable given the purchasers' advanced age.  *See* Doc. # 38, ¶ 15.  Plaintiff asserts that Allianz disregarded its own internal guidelines that made older persons ineligible to purchase deferred annuities unless they were granted a specific "aging exemption" by Allianz management.  *See id.,* ¶¶ 16-17.  Allianz also curtailed its sales agent training program and dramatically increased its sales force, resulting in agents who were uninformed about the details of the deferred annuity products they were selling.  *See id.,* ¶¶ 17-18.  Instead, agents were told to use – and not deviate from – Allianz-developed sales illustrations, marketing materials, and standard form contracts.  *See id.,* ¶ 19. As a result, Plaintiff contends that Allianz was pushing unsuitable annuities by way of misleading marketing in order to sell more products.  *See, e.g.,* *id.,* ¶ 29.

2

Plaintiff, a 40-year veteran of the financial services industry, was hired by Allianz in 2004.  *See id.,* ¶ 30.  More specifically, he was hired by GamePlan Financial ("GamePlan"), an affiliate of Allianz and one of the "Field Marketing Organizations" ("FMOs") through which Allianz sells its deferred annuities, and then entered into a separate agency agreement with Allianz that appointed Plaintiff to conduct business in Colorado.  *See id.,* ¶¶ 13, 30.  He was given little training on the deferred annuity products he was to sell; like other agents, he was simply given uniform materials developed by Allianz.  *See id.,* ¶ 30.  At the time of his hire, Plaintiff had approximately 500 clients from his previous work in the industry, most of whom were in their 60s and early 70s.  *See id.,* ¶ 19.  Over the course of his time at Allianz, Plaintiff sold a specific deferred annuity product – the MasterDex 10 – to more than 150 of his clients, generating more than $20 million in revenue for Allianz.  *See id.*  As a reward for his sales success, Plaintiff was given various incentives, including cash prizes, gifts, and all-expense paid vacations.  *See id.,* ¶ 31.  He was making $2 million per year, and was one of the nation's top five sales agents of Allianz's deferred annuity products, until his termination by Allianz in March 2006.  *See id.,* ¶¶ 1, 32.

In 2005, the Colorado Division of Insurance ("DOI") began investigating Allianz, and specifically Allianz's high volume of deferred annuity sales to Colorado's senior citizens.  *See id.,* ¶ 32.  As a result, the DOI discovered that Plaintiff was among the highest volume sellers of Allianz's deferred annuity products in Colorado.  *See id.*  Allianz terminated Plaintiff without cause in March 2006.  *See id.*  Shortly after his

termination by Allianz, Plaintiff was suspended[1] by the DOI, which characterized him as "preying on the elderly" and "being the worst kind of predator." *Id.* The DOI further ordered Plaintiff to appear at a hearing that September. *See id.*

In July 2006, Plaintiff hired Defendant Alexander, an insurance regulatory attorney, to defend him before the DOI. *See id.,* ¶ 33. Although Alexander had previously either represented or been employed by Allianz, and indeed had played a role in designing the MasterDex 10 product that Plaintiff sold to his clients, Alexander did not disclose that relationship to Plaintiff until just weeks before the DOI hearing. *See id.,* ¶¶ 33, 35. Prior to that disclosure, in late July, Allianz intervened in the DOI proceeding and promised to provide an expert witness to help Plaintiff's defense. *See id.,* ¶¶ 33-34. However, Allianz eventually withdrew from the proceeding, taking with it the promised expert witness. *See id.,* ¶ 34. After the withdrawal, Alexander's attitude about Plaintiff's chances at the hearing – which had been positive – began to change. *See id.,* ¶ 36. Alexander counseled Plaintiff to accept the DOI's offer of a seven-year insurance license suspension, which Plaintiff did, effectively ending his career as an insurance agent and financial advisor. *See id.,* ¶¶ 36, 38. Alexander then assisted Plaintiff in drafting a letter to Plaintiff's clients announcing that he had agreed to give up his license, but insisting that the MasterDex 10 was still a good product. *See id.,* ¶¶ 39, 69(H). Shortly thereafter, Alexander ceased representation of Plaintiff and returned to work with Allianz. *See id.,* ¶ 41. Allianz was eventually sanctioned by the DOI for selling unsuitable annuity products to senior citizens, although Plaintiff contends that

---

[1]   Although Plaintiff alleges that DOI suspended him, the Court believes that what Plaintiff actually meant was that the DOI suspended Plaintiff's insurance license.

the sanctions were minor compared to the penalties imposed by other states for similar conduct.  *See id.,* ¶¶ 57-58.

Given this series of events, Plaintiff contends that Allianz and Alexander, with the complicity of the DOI, conspired to make Plaintiff the focus of the DOI investigation in order to conceal the fact that Allianz was fraudulently marketing and selling improper annuity products.  *See, e.g.*, *id., ¶* 2.  That alleged conspiracy is at the heart of Plaintiff's complaint.

## STANDARD OF REVIEW

In reviewing a motion to dismiss for failure to state a claim, a court "'accept[s] all the well-pleaded allegations of the complaint as true'" and "'construe[s] them in the light most favorable to the plaintiff.'"  *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007) (quoting *David v. City & County of Denver*, 101 F.3d 1344, 1352 (10th Cir. 1996)).  The complaint will not be dismissed so long as it "contains 'enough facts to state a claim to relief that is plausible on its face.'"  *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "This requirement of plausibility serves not only to weed out claims that do not (in the absence of additional allegations) have a reasonable prospect of success, but also to inform the defendants of the actual grounds of the claim against them."  *Robbins v. Oklahoma*, 519 F.3d 1242, 1248 (10th Cir. 2008).  "Thus, the mere metaphysical possibility that **some** plaintiff could prove **some** set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason

to believe that **this** plaintiff has a reasonable likelihood of mustering factual support for

**these** claims." *Schneider*, 493 F.3d at 1177 (emphasis in original).

## ANALYSIS

### I.   PLAINTIFF'S RICO CLAIM SHOULD BE DISMISSED.

The Organized Crime Control Act of 1970 became law on October 15, 1970.

Title IX of the Act is the Racketeer Influenced and Corrupt Organizations statute, more

commonly referred to as RICO.  *See* 18 U.S.C. §§ 1961-68.  The purpose of RICO is

"the elimination of the infiltration of organized crime and racketeering into legitimate

organizations operating in interstate commerce."  S. Rep. No. 617, 91st Cong., 1st

Sess. 76 (1969).  RICO thus prohibits various aspects of "racketeering" – statutorily

defined to include gambling, bribery, extortion, and certain acts of fraud.  Specifically,

RICO makes unlawful: investment of racketeering income in an "enterprise" engaged in

interstate or foreign commerce, 18 U.S.C. § 1962(a); acquisition, through a pattern of

racketeering activity, of an interest in any such enterprise, *id.,* § 1962(b); participation,

through a pattern of racketeering activity, in the affairs of any such enterprise, *id.,*

§ 1962(c); or conspiracy to do any of the same, *id.,* § 1962(d).  The Act is not limited to

enforcement by the government; RICO's civil remedies provision grants a private right

of action to, and permits recovery of treble damages by, "[a]ny person injured in his

business or property by reason of a violation of section 1962."  18 U.S.C. § 1964(c).

In order for a private plaintiff to have standing to bring a RICO claim, he or she must

sufficiently allege (1) one or more violations of § 1962; (2) an injury to "business or

property;" and (3) a causal connection – both factual and proximate – between the two. *See, e.g.*, *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 265-68 (1992).

While not always stated with complete clarity, a fair reading of the second amended complaint indicates that Plaintiff's RICO claim focuses on an alleged scheme by Defendants to defraud Colorado consumers by marketing and selling unsuitable annuities. *See, e.g.*, Doc. # 38 ¶ 44 (alleging a "wrongful scheme to sell and market Allianz's unsuitable deferred annuity products to senior citizens . . . ."). Admittedly, at times the complaint could be read to suggest a narrower scheme directed simply at scapegoating Plaintiff in the DOI investigation. *See, e.g.*, Doc. # 38, ¶ 54 (describing a "scheme to market and sell unsuitable deferred annuities to senior citizens by means of false pretenses, representations, or promises, and to shift the blame for misrepresenting those products to [Plaintiff] and conspiring to ruin [Plaintiff's] reputation and successful career . . . ."). However, in response to the motions to dismiss, Plaintiff clarifies the allegations by describing the purported scheme as one aimed at defrauding Colorado consumers. *See, e.g.*, Doc. # 60 at 5 (noting "defendants' conspiracy to render [Plaintiff] the 'scapegoat' to conceal Allianz's RICO scheme from Colorado consumers"). Moreover, were the alleged scheme a more limited one targeted solely at Plaintiff, the RICO claim would summarily fail for lack of a "pattern" of racketeering activity. Given that "Congress was concerned in RICO with long-term criminal conduct," *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 242 (1989), courts have made clear that "the heart of any RICO complaint is the allegation of a **pattern** of racketeering," *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 154 (1987) (emphasis in original). A plot aimed simply at Plaintiff's termination and loss of license is one with

7

a discrete goal that does not implicate any sort of threat of future criminal conduct, and thus cannot meet this "pattern" requirement. *See Boone v. Carlsbad Bancorporation, Inc.*, 972 F.2d 1545,1556 (10th Cir. 1992) ("Plaintiffs allege what is actually a closed-ended series of predicate acts constituting a single scheme . . . to accomplish a discrete goal . . . directed at a finite group of individuals . . . 'with no potential to extend to other persons or entities.' Thus plaintiffs have not alleged the type of activity that RICO was enacted to address." (quoting *Sil-Flo, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1516 (10th Cir.1990))); *see also Resolution Trust Corp. v. Stone,* 998 F.2d 1534, 1545 (10th Cir. 1993) ("Where the scheme has a limited purpose, most courts have found no continuity."). For these reasons, the Court will construe Plaintiff's RICO claim as alleging a broader scheme relating to the sale of improper annuities.

Plaintiff contends that Defendants perpetrated this RICO scheme by engaging in mail and wire fraud, both of which are encompassed in the definition of racketeering activity set forth in the Act. *See* Doc. # 38, ¶¶ 52-56. *See also* 18 U.S.C. § 1961(1)(B). Plaintiff specifically alleges three RICO violations: first, he claims that Allianz violated § 1962(a) by using income generated from the fraudulent scheme to operate an "enterprise" consisting of the FMOs, including GamePlan; next, he argues that both Allianz and Alexander have conducted that enterprise's affairs through a pattern of racketeering activities, in violation of § 1962(c); and finally, he contends that Allianz and Alexander conspired to make him a scapegoat for the purposes of concealing the RICO scheme, in violation of § 1962(d). *See* Doc. # 38, ¶¶ 72-76. Plaintiff claims that he was injured as a result of the RICO scheme when he was "sacrifice[d]" to the Colorado DOI – thereby losing his job, income, and insurance license – in order to keep this scheme

8

under wraps.  *See id.,*  ¶ 77.  Plaintiff seeks $20 million in damages, and further seeks

to treble those damages under RICO.  *See id.,* ¶ 5.[2]

Defendants challenge the adequacy of nearly all aspects of Plaintiff's RICO

claim.  However, the Court need not address all of these arguments, as there are

several critical problems with Plaintiff's RICO theory that require dismissal of the claim.

A.   Plaintiff Fails to Allege Injury Caused By the Purported Violation of
§ 1962(a).

Section 1962(a) prohibits "us[ing] or invest[ing]" income derived from

racketeering activity to acquire an interest in or otherwise establish or operate an

enterprise.  As the Tenth Circuit Court of Appeals has recognized, this section does not

make the receipt of racketeering income unlawful; it prohibits only the use of such

income in the proscribed manner.  *Grider v. Texas Oil & Gas Corp.*, 868 F.2d 1147,

1149-51 (10th Cir. 1989).  Given this limitation, "a plaintiff seeking civil damages for a

violation of section 1962(a) must plead facts tending to show that he was injured by the

---

[2] Plaintiff also states that an injunction to stop Defendants' alleged scheme would be "appropriate."  *See* Doc. # 38, ¶ 82.  However, Plaintiff's prayer for relief specifically requests only damages, fees, and costs, making it questionable whether he is actually seeking an injunction.  *See id.* at 4.  In any event, such relief is not appropriate.  As a threshold matter, it is not clear whether a private plaintiff, as opposed to the government, can seek equitable relief under RICO's civil remedies provision.  *See, e.g., FDIC v. Antonio*, 843 F.2d 1311, 1313 n.1 (10th Cir. 1988).  But even assuming such a remedy is available, Plaintiff lacks standing to seek it in this case.  Again, the alleged RICO scheme is targeted at purchasers of Allianz annuities – a group of which Plaintiff is not a part.  It is well-settled that a plaintiff may not raise the rights of third-parties absent compelling circumstances.  *See, e.g., Aid for Women v. Foulston*, 441 F.3d 1101, 1111-12 (10th Cir. 2006).  Moreover, there is nothing to suggest that an injunction would redress Plaintiff's injuries.  He has already been terminated and his license has been revoked; forcing the cessation of the RICO scheme would do nothing to remedy that situation.  *See, e.g., id.* at 1109 (noting that standing requires "a likelihood that the injury will be redressed by a favorable decision").

use or investment of racketeering income.  Injury from the racketeering acts themselves is not sufficient because section 1962(a) does not prohibit those acts."  *Id.* at 1149.

Plaintiff makes no allegations – conclusory or otherwise – that he was injured "by the use or investment of racketeering income."  All specific allegations of injury relate to Plaintiff's § 1962(c) or § 1962(d) claims.  *See* Doc. # 38, ¶ 64 (alleging injury "by reason of Alexander's and Allianz's participation and control of the RICO enterprise . . . ."); ¶ 77 (alleging injury "by reason of Allianz's RICO violations when Alexander and Allianz conspired to and did sacrifice Marlow to the Colorado [DOI] in furtherance of and integral to continuing operation of the . . . racketeering enterprise in violation of § 1962(c) and (d)"); ¶¶ 80-81 (alleging injury as a result of violations of § 1962(c) and (d)).  Even a liberal reading the complaint fails to suggest how Allianz's use of allegedly ill-gotten proceeds led to Plaintiff's lost income or insurance license.  For these reasons, Plaintiff's § 1962(a) claim must be dismissed.

B.      Plaintiff's § 1962(c) Claim Against Allianz Fails to Allege an "Enterprise" Separate From Allianz.

Critical to any RICO claim is the existence of an "enterprise" that a defendant somehow controls or influences through unlawful racketeering activity.  *See* 18 U.S.C. § 1962(a), (b), (c).  For purposes of § 1962(c), which prohibits a person associated with such an enterprise from conducting the enterprise's affairs through a pattern of racketeering, "the defendant 'person' must be an entity distinct from the alleged 'enterprise.'" *Brannon v. Boatmen's First Nat'l Bank of Okla.*, 153 F.3d 1144, 1146 (10th Cir. 1998).  This requirement takes on particular importance where, as in this case, a RICO defendant is also a corporate entity, because a broad rule allowing

a corporate defendant to be both the "person" and the "enterprise" "would allow the application of RICO in every fraud cause against a corporation." *Id.* at 1147.

Applying this principle, numerous courts have indicated that where an alleged enterprise is really nothing more than a defendant corporation and its affiliates and associates conducting normal business affairs, RICO liability does not attach.  *See, e.g.*, *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.,* 30 F.3d 339, 344 (2d Cir. 1994) ("[B]y alleging a RICO enterprise that consists merely of a corporate defendant associated with its own employees or agents carrying on the regular affairs of the defendant, the distinctness requirement may not be circumvented."); *Davis v. Mutual Life Ins. Co. of N.Y.,* 6 F.3d 367, 377 (6th Cir. 1993) ("[A] corporation may not be liable under section 1962(c) for participating in the affairs of an enterprise that consists only of its own subdivisions, agents, or members.  An organization cannot join with its own members to undertake regular corporate activity and thereby become an enterprise distinct from itself.").  *See also Brannon*, 153 F.3d at 1149 (dismissed RICO claim on other grounds, but acknowledged that there is "substantial case law" for the proposition that "it is insufficient to allege merely that the RICO person is a parent corporation conducting the affairs of alleged enterprises that are also its subsidiaries and affiliates"). Limiting RICO liability when a parent corporation controls an "enterprise" that is nothing more than its corporate family makes particular sense given that such a situation is a far cry from the "prototypical" RICO case where "a person bent on criminal activity seizes control of a previously legitimate firm and uses the firm's resources, contacts, facilities, and appearance of legitimacy to perpetrate more, and less easily discovered, criminal acts than he could do in his own person." *Fitzgerald v. Chrysler Corp.,* 116 F.3d 225,

11

227 (7th Cir. 1997).  In *Fitzgerald*, the plaintiff alleged that Chrysler sold fraudulent warranties to its customers, and did so through an "enterprise" consisting of its subsidiaries and dealers.  *Id.* at 225.  In determining that the "Chrysler family" did not constitute a RICO enterprise nefariously controlled by Chrysler, the Seventh Circuit Court of Appeals explained that it "c[ould] not imagine . . . applying RICO to a free-standing corporation such as Chrysler merely because Chrysler does business through agents, as virtually every manufacturer does."  *Id.* at 227.  Unlike the prototypical case, Chrysler's use of its agents and affiliates did not "lend an air of legitimacy to a person or entity that unless masked by a legitimate-seeming enterprise would quickly be discovered to be engaged in criminal acts."  *Id.* at 227-28.[3]

In this case, Plaintiff alleges that the enterprise – which he calls the Allianz Annuity Enterprise – consists of various FMOs (like GamePlan, Plaintiff's FMO) and their sales agents.  *See* Doc. # 38 ¶ 44.  He specifically alleges that these FMOs are the entities through which Allianz markets and sells its deferred annuity products.  *Id.,* ¶ 12.  For example, GamePlan is alleged to have "conducted business on behalf of Allianz in Colorado" and to be directly controlled by Allianz.  *Id.* (alleging that "Allianz owns a controlling interest in GamePlan").  Plaintiff claims that GamePlan and its officers and employees were, at all relevant times, "acting within the course and scope" of their

---

[3]  This is not to say that a RICO enterprise can never consist of a corporate defendant and its subsidiaries or affiliates.  *See, e.g., Emery v. Am. Gen. Finance Co.*, 134 F.3d 1321 (7th Cir. 1998) (noting that an enterprise may exist if a corporate defendant is "shown to use its agents or affiliates in a way that bears at least a family resemblance to the paradigmatic RICO case in which a criminal obtains control of a legitimate (or legitimate-appearing) firm and uses the firm as the instrument of his criminality").  But where the corporate parent is simply operating the enterprise in the normal course, the mere fact that it exercises its relationships with affiliates does not, on its own, create RICO liability.

agency or subsidiary relationship with Allianz, and that their actions "were ratified and approved by Allianz."  *Id.*, ¶ 14.  The sales agents and brokers associated with the FMOs are alleged to be contractually obligated to Allianz.  *Id.*, ¶ 13 ("While the FMOs recruit and hire individual sales agents and brokers, each agent and broker enters into a separate written agency agreement with Allianz and Allianz is responsible for formal appointment as the Company's licensed insurance agent in a particular state in which Allianz conducts business.").  Plaintiff asserts that Allianz controls this enterprise by, for example, developing marketing materials, directing the sales force to use Allianz's materials and techniques, developing a sales incentive program, and issuing deferred annuity products to customers.  *Id.*, ¶ 48.  These allegations demonstrate nothing more than an enterprise, *i.e.*, the Allianz "corporate family," acting in the normal course of business.  There is no suggestion that Allianz somehow used the enterprise to lend it – the corporate parent – an otherwise-absent air of legitimacy.  This case does not even remotely resemble the prototypical RICO action.  In short, Plaintiff has not plausibly alleged that Allianz is a person sufficiently distinct from the enterprise, and for that reason has not established a § 1962(c) claim against Allianz.[4]

C.   Plaintiff's § 1962(c) Claim Against Alexander Fails to Allege That Alexander Conducted the Enterprise's Affairs.

Unlike Allianz, Alexander is certainly a person distinct from the alleged enterprise.  However, Section 1962(c) not only requires distinctness, it also requires

---

[4]   Plaintiff points to the Ninth Circuit's decision in *Odom v. Microsoft*, 486 F.3d 541 (1993) in arguing that Allianz and the enterprise are distinct entities.  *See* Doc. # 60 at 8-9.  However, the alleged enterprise in *Odom* was an association between two undisputably separate corporate entities – Best Buy and Microsoft – and not, as in this case, between a parent corporation and its subsidiaries, agents, or affiliates.

a defendant to "conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). The Supreme Court has adopted the so-called "operation or management" test to determine whether this element is met. *See Tal v. Hogan,* 453 F.3d 1244, 1269 (10th Cir. 2006) (citing *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993)). "For liability to be imposed under that test, the defendants must have participated in the operation or management of the RICO enterprise, although it is not necessary for the participant to have significant control." *Id.* (quotations and citations omitted). RICO liability is not limited to those with "primary responsibility" for the enterprise's affairs, nor is it confined to those with a "formal position" in the enterprise, "but **some** part in directing the enterprise's affairs is required." *Reves*, 507 U.S. at 179 (emphasis in original).

Plaintiff repeatedly alleges that Alexander's management of the enterprise was limited to Plaintiff and his associate, Joe D'Altilia, another member of the Allianz sales force. *See, e.g.*, Doc. # 38, ¶¶ 48, 66; *see also* Doc. # 59 at 3. It appears that Plaintiff's theory is that because he and D'Altilia are both members of the Allianz sales force, and therefore a part of the alleged enterprise, Alexander's purported control of them is sufficient to show control of the enterprise under the "some part in directing" standard articulated in *Reves*. *See, e.g.*, Doc. # 59 at 3 (stating that "Alexander knowingly directed **part of the RICO enterprise's affairs** by controlling and managing Marlow and Joe D'Altilia") (emphasis added). But **directing some part of** the enterprise's affairs is not the same as **having some part in directing** the enterprise's affairs. As noted above, the alleged enterprise consists of the FMOs and their sales agents;

Plaintiff alleges that there are approximately 200 FMOs representing more than 155,000 agents. *See* Doc. # 38, ¶ 12. Merely because courts have indicated that liability under RICO is not limited to those who have "primary responsibility" or a "formal position" in the enterprise does not mean that there are no limits on the degree of control necessary to be deemed a responsible party under RICO. Extending RICO to the facts of the instant case, *i.e.*, because Defendant Alexander allegedly "controlled" two of the tens of thousands of agents associated with Allianz through the FMOs, would eviscerate the limitations intended by the "operation or management" test, which restricts liability to those persons who have "participated in the operation or management of the enterprise **itself**." *Reves*, 507 U.S. at 183 (emphasis added); *see also id.* at 184 ("[I]t is clear that Congress did not intend to extend RICO liability under § 1962(c) beyond those who participate in the operation or management of an enterprise through a pattern of racketeering activity.").[5] Alexander's asserted control over Plaintiff and D'Altilia is insufficient to establish a § 1962(c) claim.

D. <u>Plaintiff Cannot Show That His Injuries Were Proximately Caused By The Purported § 1962(c) Violation</u>**.**

Finally, even if Plaintiff had stated a § 1962(c) violation, he has not sufficiently alleged that his injuries were caused by that violation. Causation in the RICO context requires a plaintiff to show both "but for" causation and proximate causation. *See, e.g.*, *Holmes*, 503 U.S. at 265-68. The essence of Plaintiff's allegations is that the § 1962(c)

---

[5] The "operation or management" test is not restricted to upper-level management; lower-level participants acting at the direction of upper management may also be liable. *See Reves*, 507 U.S. at 184. But again, Plaintiff's allegations are not that Alexander was acting at the direction of upper management, but rather that he himself controlled or participated in the control of the enterprise by managing Plaintiff and D'Altilia.

RICO scheme (defrauding Colorado annuity customers) caused his injuries (termination from Allianz, the loss of his insurance license, and the loss of his income) because Defendants would never have had reason to sacrifice him to the DOI unless they needed to cover up their unlawful racketeering activities. *See* Doc. # 60 at 10-11. Although these allegations establish a "but for" causal connection between the scheme and the injuries, proximate causation requires more. *See, e.g.*, Gregory P. Joseph, *Civil RICO: A Definitive Guide* 31 (1992) ("Legal liability does not extend as far as factual causation."). There must be some "'direct relation between the injury asserted and the injurious conduct alleged.'" *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 457 (2006) (quoting *Holmes*, 503 U.S. at 268). In imposing a proximate cause requirement on RICO plaintiffs, the Supreme Court recognized that it would, in effect, "limit a [RICO defendant's] responsibility for the consequences of that person's own acts." *Holmes*, 503 U.S. at 268. Such a requirement was acceptable, however, for reasons of administrative necessity. "[T]he less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent factors." *Id.* at 269. Further, without a proximate cause requirement, courts would be forced to "adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries." *Id.* And finally, the Court noted that a proximate cause requirement would not absolve RICO violators of their wrongs "since directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely." *Id.* at 269-70.

16

These principles compel the result in this case.  As Plaintiff himself implicitly acknowledges, the RICO scheme is not the "direct" cause of his injuries.  Rather, the direct cause was the DOI's revocation of his license.  *See* Doc. # 38, ¶ 38 (noting that he "reluctantly agreed" to accept the DOI's offer of a seven-year license suspension and that "[c]onsequently, his career and a life insurance agent and financial advisor was effectively terminated").  Thus, a court or jury would have to grapple with apportioning fault, and damages, between the allegedly wrongful RICO acts and other independent factors (such as the DOI's revocation action).  Moreover, if in fact there is an unlawful scheme to defraud Colorado seniors, the direct victims – the purchasers of the annuities – are in a position to see that scheme exposed and the offenders punished.  *See Anza*, 547 U.S. at 460 ("The requirement of a direct causal connection is especially warranted where the immediate victims of an alleged RICO violation can be expected to vindicate the laws by pursuing their own claims.").  Indeed, it appears that this is precisely what is occurring; Plaintiff's complaint notes that a RICO class action lawsuit has been filed on behalf of a nationwide class of "persons 65 years of age or older who purchased one or more Allianz deferred annuities," alleging that Allianz orchestrated a conspiracy to take advantage of older purchasers of its deferred annuity products.  *See* Doc. # 38, ¶¶ 50-51.

Although it does not appear that the Tenth Circuit has considered the issue, numerous other courts have held that a person similarly positioned to the Plaintiff in the instant case does not have standing to bring a RICO claim.  For example, in *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21 (2d Cir. 1990), the plaintiff asserted that he was terminated for refusing to conceal his employer's RICO frauds, causing him

17

injury in the loss of his employment and commissions.  *Id.* at 22.  Affirming the district court's dismissal of the claim, the Second Circuit found that the plaintiff's alleged injuries were not reasonably foreseeable consequences of the RICO violations, and underscored that "the purpose of civil RICO liability does not extend to deterring any illegal act such as retaliatory firings for which there are state and common law remedies."  *Id.* at 24.   Although *Hecht* dealt with allegations of retaliatory termination, rather than Plaintiff's claim that he was terminated to preempt the exposure of the RICO scheme, other courts have noted that such a distinction makes no difference.  *See Pujol v. Shearson/Am. Exp., Inc.,* 829 F.2d 1201, 1205 (1st Cir. 1987) (noting that such a distinction likely would not have "any meaningful concrete application," as most complaints could be "construed as alleging either a 'preventive' or a 'retaliatory' dismissal," and further noting that even if the distinction were valid, preventative dismissal is not an act committed "by reason of" the underlying RICO violations); *Burdick v. American Express Co.*, 865 F.2d 527, (2d Cir. 1989) (following *Pujol*). Underlying these cases is the basic notion that, in the RICO context, those with reasonably foreseeable injuries (*i.e.*, injuries proximately caused by the RICO violations) are generally "the targets, competitors, and intended victims of the racketeering enterprise."  *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 124 (2d Cir. 2003).

For all of these reasons, even assuming a viable § 1962(c) scheme to defraud Colorado seniors, Plaintiff's injuries were not proximately caused by that scheme.  While such actions may have been wrongful, they were not violations of RICO.

18

E.   Plaintiff's § 1962(d) RICO Conspiracy Claim Fails For Lack of an
     Underlying RICO Violation.

"By its terms, § 1962(d) requires that a plaintiff must first allege an independent

violation of subsections (a), (b), or (c), in order to plead a conspiracy claim under

subsection (d)." *Tal*, 453 F.3d at 1270.  Plaintiff alleges that Allianz and Alexander

conspired to violate § 1962(c).  *See* Doc. # 38, ¶ 80.  As described above, however,

Plaintiff has not pleaded a viable § 1962(c) claim; therefore, his § 1962(d) conspiracy

claim necessarily fails as a matter of law.[6]  *See Tal*, 453 F.3d at 1270.

## II.   PLAINTIFF'S PENDENT STATE LAW CLAIMS SHOULD BE DISMISSED.

Plaintiff acknowledges that the only independent claim giving rise to federal court

jurisdiction is his RICO claim, and asserts his additional claims, grounded in state law,

under the doctrine of pendent jurisdiction.  Doc. # 38 ¶ 6.  But having dismissed

Plaintiff's only federal claim, it would be inappropriate to exercise jurisdiction over the

remaining state law claims.  *See, e.g.*, *McWilliams v. Jefferson County*, 463 F.3d 1113,

1117 (10th Cir. 2006) ("[T]he pre-trial dismissal of all federal law claims, leaving only a

state law claim, generally prevents a district court from reviewing the merits of the state

law claim.").  Those claims are therefore dismissed as well.

### CONCLUSION

---

[6]   Although Plaintiff alleges that Alexander himself violated a substantive RICO provision
– § 1962(c) – the real focus of his claim against Alexander appears to be that he conspired to
further Allianz's substantive RICO violation.  *See* Doc. # 59 at 3 (alleging injury "'by reason of'
Allianz's RICO scheme when Alexander and Allianz conspired to and did sacrifice [Plaintiff] to
the [DOI] to conceal Allianz's racketeering activity . . . .").  It is certainly true, as Plaintiff argues,
that a plaintiff may sue a co-conspirator for violation of § 1962(d) even if that co-conspirator did
not himself violate one of the substantive provisions of § 1962.  *See Beck v. Prupis*, 529 U.S.
494, 506-07 (2000).  Had Plaintiff pleaded a substantive RICO claim against Allianz, his
conspiracy claim against Alexander may well have been proper.  However, as Plaintiff has
failed to plead an independent RICO violation by Allianz, a conspiracy claim cannot stand.

While Plaintiff's allegations may suggest wrongful conduct, they do not fall within RICO's bounds.  There is no contention that Plaintiff was injured as a result of Allianz's purported use of racketeering income, and thus Plaintiff cannot assert a RICO § 1962(a) claim.  Nor do the allegations meet certain key elements of a § 1962(c) claim: Allianz cannot be said to be distinct from the enterprise, which is merely Allianz and its affiliates acting as a normal corporate family; Alexander's alleged control of two of the myriad Allianz sales agents does not constitute "operation or management" of that massive enterprise; and Plaintiff, who was not the target of the RICO scheme, cannot show that his injuries were proximately caused by that scheme.  Without a substantive RICO violation, Plaintiff's § 1962(d) conspiracy claim must also fail.  And without the RICO federal claim, asserting jurisdiction over the remaining state law claims would be improper.

Accordingly, it is

ORDERED that Defendants' motions to dismiss (Docs. # 57 & 58) are GRANTED.  As Plaintiff has filed three complaints, and as the facts as alleged simply do not make out a RICO claim, Plaintiff's RICO claim is DISMISSED WITH PREJUDICE.  Plaintiff's additional state law claims are DISMISSED WITHOUT PREJUDICE.  It is

FURTHER ORDERED that Defendants shall have their costs by filing a bill of costs with the Clerk of this Court within ten days of the entry of judgment.

DATED:  May   12  , 2009

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge